of the day. Where are we on case number one? Okay, case number four, Nadmid v. Holder, 14-77. Mr. Sager. Good morning, Your Honors. Jason Sager on behalf of the appellant, Mr. Nadmid. This case is on appeal from the Board of Immigration Appeals that affirmed the immigration judge's decision denying my client's asylum claim. We're arguing that the judge's finding was clearly erroneous. His finding that my my client was not, Mr. Nadmid, was not credible at his asylum hearing is clearly erroneous based on the evidence and the testimony which we feel would compel a different conclusion. Specifically, the IJ was concerned with discrepancies between Mr. Nadmid and the airport, which were taken in a language in which he was not fluent, Russian language. He is a Mongolian speaker, but he was not offered an interpreter in the Mongolian language. And there seemed to be some confusion during that interview. There seemed to be a lot of confusion. In fact, in my brief, I mentioned specific instances where Mr. Nadmid was asked questions and he was confused about how to even answer them, even if the meaning of the question, he was, really the answers were nonsensical if you if you look at what the questions were being asked. Now, the judge argued that in his in his decision and the board agreed with him that since Mr. Nadmid could answer to basic biographical questions that that meant somehow that he could somehow give lucid answers to questions regarding his fear of returning to Mongolia in a situation where he was detained and asked by an officer who was not an trained asylum officer, but an officer who is working at the border at the airport. But his Russian may have been somewhat sufficient to give basic biographical information. I think anybody who's had maybe a year or a semester of any language may be able to do that. That doesn't mean they're fluent and can give answers to specific instances which were that the border protection agent was asking him. And I believe the judge erred by giving weight to that statement when afterwards when he was given a credible fear interview, which was really should be the determining factor. It's the first step when a person asks his fears returning to their home country, an asylum officer interviews them. And that was done a month later in Mongolian. And the answers he gave at that interview were consistent with his testimony and the documents that he submitted, as well as the corroborating evidence that we find in the country reports and the expert witness who testified at his hearing. Now the newspaper article the IJ pointed out that it wasn't clear where that came from. My client, that was sent to him by his brother. Evidently I think you're referring to the article that was written about my client. There was another article that my client actually submitted, Mr. Nodmit, submitted to cover the corruption in the government, particularly with regard to the businesses, to business practices there. That article, the article, the second article about Mr. Nodmit was given to him by his brother and sent over later. So that was actually published? That was, we believe that was all, it was all published. I mean there's no indication that any of this evidence is not legitimate in any way. The only issue appears to be this initial interview at the airport and the judge and the BIA have used that to show that Mr. Nodmit, in their opinion, is not credible because of the discrepancies in that. But on the contrary, he was not asked any questions in his native languages and was not given an interpreter in his native language, so was not able to give any lucid answers and any answers that I think could be used against him to improve his credibility in court. So the argument about the corruption, now this is going on a little further. Are these people, these are government agents of some kind that are threatening him? Well they were government employees. He gave a speech at a rally and he implicated certain members of the government of corruption. And soon after that they came to him, some people came to him and beat him and were asking him why he had such a big mouth and along those lines basically referring why did he say these people were going to kill him. He later published an article about it and the threats kept coming and at one point they took him to a cemetery and were allegedly going to kill him. He managed to escape. They mean the same people that threatened him in the first place or are these different people? I think these are the same people that threatened him in the first place. And it's clear that those people were at least government employees? What were they? They were government employees who were in charge, to my understanding, were in charge of giving out licenses for businesses. Giving out licenses? And they were taking bribes. Okay so there's some kind of official capacity in the government? They do have some official capacity in the Mongolian government. And the expert witness corroborated all that. The expert witness, who was an expert on the politics and the country conditions in Mongolia, testified that that does happen quite frequently in Mongolia. It's a very corrupt system and that there are repercussions to speaking out against that system and very much similar to what Mr. Nadmid was facing thereafter. He tried to, in his own way, try to fix the system and be honest about it. You may think the judge's adverse credibility finding affected the rest of the decisions with regard to his political opinion and the social group. Finding that he, Mr. Nadmid, did not fit into one of those groups. Basically going back again to his credibility and simply based on his statement that he gave at the airport while detained with an officer in a language that was not Disney-defined. Now in the positive fear, the positive credible fear determination in that interview that was quite detailed in terms of what had happened to him chronologically and in terms of specific facts. Right, the positive fear interview was done properly. That was with a Mongolian interpreter and that was done later in January of following year with a trained asylum officer and they found that there was a credible fear and the officer even noted at some point that Mr. Nadmid had been asked in Russian something about these questions and didn't understand them and in fact there was even an issue noted by that officer with the Russian interpreter who Mr. Nadmid says was not even a good interpreter. Basically the entire communication at that moment was... You're in your rebuttal time, you know. Okay, I'll stop now. Let me ask you a question though. This interview you said took place about a month after that initial interview. Correct, the initial interview at the airport, Customs and Border Protection, was in December of 2009. And in that, interview it's noted in the record that he made reference to the newspaper articles which he then produced at the hearing. Correct, Your Honor. He was very consistent at every point of the process. All right, thank you. Mr. Stahls. Good morning, Your Honors. Counsel, may it please the Court, Rob Stahls on behalf of the Attorney General. Your Honors, the burden was on Petitioner here and the testimony, but also the burden to produce corroborative evidence. Now with respect to that... Produce what? To produce corroborative evidence, Your Honor. And with respect to that second part of his burden on corroboration, Petitioner had never addressed the findings of the immigration judge that he did not corroborate as required under the Act. He never briefed here before this Court the Board's conclusion that he should have corroborated his testimony. And so he has waived those issues. I believe at this point, Your Honor, that's a dispositive finding. But he cannot demonstrate eligibility because the burden was on him to produce reasonable corroborative evidence, and he didn't. Particularly with relation to... I think the evidence that the immigration judge said he wanted to see was evidence from witnesses who were there. Petitioner testified that his employees had witnessed some of the events, that his family had witnessed some of the events, but corroborating evidence in the form of letters or attestations of some kind from those witnesses never appeared. The same goes for... The immigration judge suggested that there should have been more evidence of his business. Because, of course, the claim hinges on the idea that he was being attacked because... through his business, right? The $200,000 was going to be extorted from him that he allegedly possessed. But there was no evidence, really, that the business ever... I think there's evidence that the business existed, but not that it... that he was capable of being extorted for $200,000. I would disagree with counsel because I don't recall from the record that he ever testified they were government agents. The immigration judge specifically asked him, well, how did you know that these people that came after you were coming after you because you criticized the government? And he says, well, it happened later. In other words, he was making an assumption. He said he didn't know who the men were. The only time he ever knows one of the men is when he testified he went to the graveyard, allegedly to be executed, and one of the men was a person who didn't work in government. He said he was a former shop worker that he had worked with previously in the USSR, which it doesn't, you know, it's not a government agent. But the IJ seems to rely heavily on this initial interview, and it's very, it seems pretty clear that he didn't understand Russian very well. I'm glad you brought that up, Your Honor. And he admits that he didn't understand Russian very well, and some of the answers are inconsistent. Yes, I want to talk about those interviews because there were two of them, Your Honor. There were two airport interviews in December, one in which started in the Russian language. He was asked basic biographical information, which he was able to answer, because he testified that he had attended a technical school in the USSR that was a Russian language school, that he graduated with the degree, so that he knew some Russian, a little. And in that first interview, the questions were not, the question, are you afraid to return to your country, was asked him, to which he replied no. Now that's a basic question, Your Honor. Are you afraid? That's basic. And the next question in that first interview was, are you going to be harmed if you get returned to your country? And he said no. And then he asked to speak to his daughter on a telephone, and went away. And then there was a second interview at the airport, and in that second interview, that's when he started to suggest, oh actually, I am afraid, and it appears that he suggested he was afraid of a business deal gone bad. The number $200,000 comes up again. The friend, Segmed, comes up again in that airport interview that he later testifies to before the immigration judge. Was the second interview in I guess you could say loquacious or something? He spoke more and then expressed something different than in the first interview? Indeed. In the first interview, he was asked, are you afraid? He said no. In the second interview, he was asked, are you afraid? And he said yes. And he described this business deal gone bad, that he was running from, I guess, debt collectors who were trying to collect $200,000 from him. And then he provided, in terms of what he said in the second interview, and the people who owned the business, he provided two newspaper articles. You're talking later, during the immigration proceedings. Yes. Yes, but the attack then wasn't related to a business deal gone bad anymore. Once it got to before the IJ, it was related to this speech that he had made, allegedly, that the complaint of government corruption. Right. But I want to... Which then also became one of his claims. Right. I should point out, Your Honor, that the adverse credibility determination, apart from the corroboration determination, which are two separate things, but the adverse credibility determination didn't rely solely on the discrepancies between these two airport interviews and his testimony before the IJ. Additionally, the immigration judge was concerned about the vagueness of some of his claims. The immigration judge and the board both cited the implausibility of some of his claims. I might point out the inconsistency. Apparently, they were trying to extort $200,000 from him, but also tried to kill him, which seems confusing since, of course, you can't get $200,000 off of a dead man. So there were other inconsistencies and vagueness and implausibility cited by the immigration judge. Well, those threats could have also been taken, the threats to kill him, that if he didn't pay, that's what would happen. Perhaps, but that's not what he suggested. Right. He suggested he got away from them in the cemetery because his friend Segmed let him go, which is the reverse of Segmed's role, as described in his airport interview, when he said Segmed was the one who was trying to get the $200,000 from him. So, I mean, there's, like I said, there's an inconsistency in these interviews where they're pointing out essentially similar elements, but they take diametrically opposite positions in his narrative. And so this is what led the immigration judge at the end of his decision to say, I didn't know which story to believe, which is a classic adverse credibility situation. When the immigration judge said, look, I've looked at all your evidence, I've taken into account, the immigration judge said, the fact that you only had basic Russian, but he didn't, you know, he found that it was enough question to find against him in terms of adverse credibility, and then go on to say, and also I would have liked to see some corroboration, which as I said is a separate finding. Well, what is a social group? Is it businessmen who are being threatened or something? Yes. I know the board didn't address that issue, but I think it was businessmen who were being threatened on account of speaking out publicly was the proposed social group, but the board never reached the social group issue. They concluded their decision. Well, the only reason I mention that is because that's sort of an if this had had something not political, but was more of a economic extortion? Well, I think if it was economic extortion, gosh, I hesitate to make a guess at that, Your Honor, but I don't want you to guess. I'm just curious about it, because what we're trying to explain here is that he's in fear of people killing him, but then there's this $200,000, and we're not even clear it's a loan or whether he's even clear of it, but there's a difference between political commentary and just somebody who's fear of somebody who's gonna kill him if he doesn't pay money. Right, I see what you're getting at, Your Honor. Politics, of course, is one of the protected grounds in that act. To get to this business deal, I suppose, like you say, Your Honor, you have to go through some political, particular social group, which is what he did raise below, but like I said, the immigration judge never found it necessary to reach it, and the board didn't, because he was not credible, because he didn't corroborate his arguments. The only merits finding below was the Convention Against Torture Claim, which both the immigration judge and the board found that he had not presented sufficient evidence to demonstrate that he would have been tortured by public officials. Right, and this is where I... Is this the cat part? Yes, Your Honor. And then, but Dr. Campy also corroborated the testimony in terms of the high-level official corruption was pervasive there, that the two officials that Namit actually spoke out against it, the protests that violently retaliated in the past against political dissidents, and that this cemetery visit was a common tactic of party bosses to intimidate. Right, which would have been known to him, but she said that she didn't know that with respect to him, right? She's not testifying with respect to his case. She's simply saying, well, this is consistent with country conditions. No, but she's saying, no, but that serves as some corroboration for what he said. Sure, she did, Your Honor. But again, it's not enough, right? Because the immigration judge still has a question of, what is this about? Why is this occurring to him? And he could have made up those things by presenting corroborative evidence from, for example, the family members who allegedly witnessed it, the employees who allegedly witnessed it, business documents that would indicate that the amount, things like that, Your Honor, that would be required under the standard under the statute. If there are no other questions, Your Honor. Thank you. Thank you for your time. You have two minutes. Mr. Sager. First, I'd like to address the issue of corroboration. Excuse me, thank you. I mean, the issue of corroboration, the judge didn't really go into that because he found him not credible. So any Mr. Nadmid, since he wasn't, there was an adverse credibility finding, the judge didn't find it plausible anyway. But he actually was very consistent at every moment except for the interview that was given in a language which was not his native language, and he clearly said it wasn't, and he didn't understand it very well. He provided consistent testimony in his credible fear interview. He provided the articles. He provided medical records and an expert witness that all corroborated, as well as the country reports and articles, that all happened to him. In addition to his own testimony from the time of the credible fear hearing on through the individual hearing with the judge was credible, was consistent. But only because of this one interview that happened at the airport. And I'd also like to address, before I forget, there's an assumption that Mr. Nadmid understood what afraid or fear means in Russian. He may not. We can't assume that. He came here after a long flight, wanted to speak to his daughter, and then an hour or so later they had another interview for him. That's not unusual, and I don't want to make any assumption about what he did or didn't understand about what the officer asked him the first time. The fact is, Russian is not his native language, and using that to impeach him is unreasonable. And if that's not used, it should never have come in to begin with. There was no one to even check whether those statements that the officer wrote down after the interview were even accurate, because nobody was present at the interview. No attorney was there, and Mr. Nadmid doesn't speak English either. He couldn't read that and say, oh this is correct. So all that created problems for everything else he submitted later on. And as far as the people who did harm to him, they may not have been the people that he claimed were involved in the corruption, but they knew about it. And when he was beaten the first time, they referenced what the speech he gave implicating them in corruption. All right, thank you. Thank you, Your Honor. We'll take the case under advisement. Thank you. And I'll call the, okay, the first case of the day.